**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REBECCA FRANCESCATTI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 11 CV 5270 |
| | ) | Hon. Marvin E. Aspen |
| | ) | |
| STEFANI JOANNE GERMANOTTA | ) | |
| p/k/a LADY GAGA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Court Judge:

Presently before us is a motion for summary judgment filed by Defendants Stephani

Joanne Germanotta p/k/a Lady Gaga ("Gaga"), Interscope Records, Universal Music Group, Inc.

("UMG"), DJ White Shadow, LLC ("DJWS, LLC"), and Brian Joseph Gaynor ("Gaynor").

Defendants contend that Plaintiff Rebecca Francescatti's ("Francescatti") music copyright

infringement case should be dismissed because she cannot prove that (1) Defendants had access

to and actually copied the protectable expression embodied in Francescatti's song, and (2) Gaga's

song sounds substantially similar to Francescatti's. (Def.'s Br. 1.) For the reasons discussed

below, we grant Defendants' motion because no reasonable trier of fact could find that the songs

are substantially similar.

**BACKGROUND**

Francescatti, a songwriter and performing artist who resides in Chicago, Illinois, is the

author of her musical work titled "Juda" ("Francescatti Song"). (RSOF ¶¶ 2, 7.) Defendant

Gaynor was the sound engineer and bassist for the re-recording of the Francescatti Song. (*Id.* ¶ 10.) Defendant Gaga is a "well-known, popular media star performing under the name 'Lady Gaga'" and created the song "Judas" ("Gaga Song"). (*Id.* ¶ 3.) Defendant DJWS, LLC is an Illinois limited liability company that was originally formed by Gaynor, DJ Paul Blair p/k/a DJ White Shadow ("Blair"), and Brian Lee ("Lee"). (*Id.* ¶ 6.) Defendant Interscope Records, a division of UMG, is the record company to which Gaga is signed and which released the Gaga Song and the album in which it appears, *Born this Way*. (SOF ¶ 4.) Francescatti contends that Gaga's song "Judas" infringes upon Francescatti's copyright in her song "Juda." (Compl. ¶ 37.)

### A. Defendants' Motion to Strike

The parties have filed lengthy Local Rule 56.1 statements, and virtually all of the 122 statements of fact are disputed in whole or in part. Much of the forty additional statements of fact are disputed as well. Defendants also filed a motion to strike portions of Francescatti's response to Defendants' 56.1 Statement of Undisputed Facts. (Def.'s Mot. to Strike.)

The Local Rules "assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (quoting *Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999)). The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion" to require compliance with the Local Rules. *Bordelon*, 233 F.3d at 527 (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting cases)).

With one exception to a fact that concerns a glissando (RSOF ¶ 91), we have not relied

upon the material that Defendants have asked us to strike. We therefore deny the motion in two parts. We deny Defendants' motion as to the fact about the glissando that appears in paragraph 91 of Francescatti's Responses because, despite what Defendants argue, it does not introduce new facts in violation of Local Rule 56.1. Rather, Francescatti disputes Defendants' statement about the placement of a glissando in the two songs with evidence that points to their similar placement. In accordance with the local rule, this response includes a "disagreement" with "specific references to . . . parts of the record." L.R. 56.1(b)(3)(B).[1]

We deny the motion to strike with regard to the remaining disputed facts because they are irrelevant to our decision. Thus, without getting caught up in this labyrinth of disputes, the basic facts are as follows. *See Zimnicki v. Gen. Foam Plastics Corp.*, 09 C 2132, 2011 WL 5866267, at *1 (N.D. Ill. Nov. 22, 2011).

### B. Facts

In 1998, Francescatti wrote a song entitled "Juda," which she states is both about an acquaintance, Juda, whom she met while working at the Chicago Board of Trade and about her betrayal of her father. (Francescatti Dep. 138–140, 143, 173–74.) The song was registered with the Copyright Office initially in 1999 for guitar and voice. (*Id*. at 209:16–20.) Francescatti registered it again in 2005 after working with Gaynor on a new recording that added "drums, bass, strings, background vocals, sound mapping and samples (self made)." (SOF ¶ 10.)

In January 2010, Lee introduced Gaynor to Blair for the purpose of creating original material for Gaga to use in her *Born This Way* album. (RSAF ¶ 1.) On January 27, 2010, Blair

---

[1] In any event, this fact about the glissandos has no effect on the outcome of our decision.

provided fourteen mp3 music tracks to Gaga via a file sharing service–download link. (RSAF ¶ 2.) Later in April 2010, Blair sent some of his own "on-the-verge stuff" to Gaga. (*Id*. ¶ 5.) Although Blair could not identify or recall many of the details of the music that he provided to Gaga between January 2010 and May 2010, he denies having heard or received a copy of the Francescatti Song and denies giving a copy of the song to Gaga. (SOF, RSOF ¶ 115.) Blair ultimately received producer and/or writer credit for contributions to nine songs on the initial release of the *Born This Way* album. (RSAF ¶ 31.) Gaynor also worked on and received credit for contributions to the album. (*Id*.) According to Blair, Gaynor, and Gaga, however, neither Blair nor Gaynor worked specifically on the Gaga Song. (SOF ¶ 116.)

Meanwhile, Gaynor worked with Francescatti in April 2010 on material unrelated to the Francescatti Song. (RSAF ¶ 6.) In an email on May 1, 2010, Gaynor informed Francescatti that he had placed three tracks on Gaga's next album and was being flown to meet Gaga in Paris. (*Id*. ¶ 8.) Then on June 9, 2010, Gaynor again emailed Francescatti stating that he had in fact met Gaga on his trip to Europe. (*Id*. ¶ 11.) He later recanted in a deposition, stating he lied to Francescatti to lead her on. (*Id*.) The parties therefore dispute whether Gaynor met Gaga on this trip. (SAF ¶ 8; RSAF ¶ 8.)

With respect to the Gaga Song, Nadir Khayat, professionally known as RedOne ("RedOne"), testified that he compiled much of its musical accompaniment in Stockholm, Sweden, prior to working with Gaga on the song in Amsterdam and in Paris. (RedOne Dep. 43:8–23, 46:1–5.) On May 9, 2010, Gaga decided on "Judas" as the title of the song because she missed her ex-boyfriend and thought of him as "Judas, he's the betrayer of all things, you know, because Judas is the biblical betrayer of all things[.]" (SOF ¶ 9.) In addition to Gaga and

RedOne, the other individuals who were present and who worked on recording, mixing, and producing the Gaga Song include Trevor Muzzy, Dave Russell, Vincent Herbert, and Taymor Braxton. (RSAF ¶ 28.)

Throughout 2010 and early 2011, additional edits were made to the Gaga Song, which was ultimately published on April 23, 2011.[2] (Gaga Dep. 103:22–104:2.) Also in April 2011, Blair and Gaynor worked on the Gaga Song "remix" (a version of a song that can be used "for a different purpose than the original song"). (SOF ¶ 119.)[3] Although Blair and Gaynor worked on the Gaga Song remix and certain songs for the *Born This Way* album (Blair 30(b)(6) Dep. 60:18–61:19), Blair and Gaynor deny that they assisted with or discussed the original creation of the Gaga Song with Gaga or RedOne (SOF ¶ 116). According to Gaga, she first heard the Francescatti Song on July 19, 2012, after the Gaga Song was published. (Gaga Dep. 24:8–22.) The parties dispute whether Gaynor, in working with Blair on material for Gaga's *Born This Way* album, exposed Gaga, either directly or indirectly through Blair, to the Francescatti Song. (SOF ¶¶ 114–16; RSOF ¶¶ 114–16.)

---

[2] Over the course of discovery, nearly twenty gigabytes of production and session files detailing the creation of the Gaga Song from the first recordings on May 9, 2010 through the song's release have been produced. (SOF ¶ 26.) Plaintiff disputes the extent of production but offers no evidence to the contrary. (RSOF ¶ 26.)

[3] Although the statement of facts states that both Blair and Gaynor worked on the remix, only Blair is mentioned in the cited record. (*See* SOF ¶ 119 (citing Blair Dep. 30:2–23, 214:6–14).)

## DISCUSSION

### A. Standard of Review

Summary judgment will be granted in favor of the moving party if "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, we must view evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmovant's favor. *Allen v. Destiny's Child,* 06 C 6606, 2009 WL 2178676, at *2 (N.D. Ill. July 21, 2009) (citing *Omega Healthcare Investors, Inc. v. Res-Care, Inc.,* 475 F.3d 853, 857 (7th Cir. 2007)). The nonmoving party, however, may not simply rest upon the pleadings but must instead come forward with specific facts showing that there is a genuine issue for trial. *Allen*, 2009 WL 2178676, at *2 (citing *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008)). While we do not make credibility determinations or weigh conflicting evidence, *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005), we must "function as a gatekeeper," in determining whether the plaintiff has produced sufficient evidence with regard to each essential element of the plaintiff's claim, *Myers v. Ill. Cent. R.R. Co.*, 679 F. Supp. 2d 903, 917 (C.D. Ill. 2010).

### B. Copyright analysis

"To establish copyright infringement, one must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *JCW Invs., Inc. v. Novelty, Inc.,* 482 F.3d 910, 914 (7th Cir. 2007) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991)). Because Francescatti is the

owner of a valid copyright (SOF ¶¶ 9–10), the only issue before us for summary judgment purposes is whether she has produced evidence of actionable copying of the original elements of her song. Since it is virtually impossible to offer direct proof of copying, plaintiffs frequently establish copying circumstantially. *Zimnicki*, 2011 WL 5866267, at *2; *Allen*, 2009 WL 2178676, at *3. We may infer copying "where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *JCW Invs.,* 482 F.3d at 915 (quoting *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries,* 272 F.3d 441, 450 (7th Cir. 2001)). Although we find that Francescatti has established a reasonable possibility of access, no reasonable juror could find that the songs are substantially similar.

### 1. Access

Defendants contend that they are entitled to summary judgment because Francescatti cannot show a reasonable possibility of access. (Def.'s Br. 26.) In support of this contention, they present evidence that neither Gaga nor Blair heard the Francescatti Song prior to this litigation. (Gaga Dep. 24:8–22; SOF ¶ 115.) In addition, Defendants present the testimony of Gaynor, who worked on the Francescatti Song, who attests that he did not give the Francescatti Song to either Blair or Gaga, that he never worked on the Gaga Song, and that he never had direct contact with Gaga. (SOF ¶¶ 18, 115–16; RSAF ¶ 11.) Defendants add that it was not until after the Gaga Song was published that Blair and Gaynor worked on its remix. (SOF ¶ 119.)

Proof of access is "an important component" of the circumstantial evidence supporting an inference of copying. *Allen*, 2009 WL 2178676, at *5 (citing *Selle v. Gibb,* 741 F.2d 896, 901 (7th Cir. 1984)). "As a threshold matter," a plaintiff must prove access through "evidence which would establish a reasonable possibility that the accused work was available to the alleged

infringer." *Selle*, 741 F.2d at 901. Francescatti may plausibly plead that her song was available to Defendants with facts alleging that they had the opportunity to view the protected item. *Peters v. West*, 776 F. Supp. 2d 742, 748 (N.D. Ill. 2011) (citing *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502, 508 n.5 (7th Cir. 1994)). Again, "a defendant's opportunity to view the copyrighted work must exist by a reasonable possibility—not a bare possibility." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.02[A] (2013). Distinguishing "bare" from "reasonable," as the case law demonstrates, is "anything but straightforward." *Id*. What is clear, however, is that while an inference of access may not be based on mere conjecture or speculation, *Selle*, 741 F.2d at 901, Francescatti need not prove that Defendants were actually exposed to the song. Whether the alleged infringer actually availed herself of the opportunity to view the protected work is relevant to "the ultimate issue of copying, and not the subordinate issue of access." *Nimmer* § 13.02[A].

One way that a plaintiff can establish that a defendant had the reasonable opportunity to view the protected item is through proof of a "'nexus' between the alleged copier and the individual possessing knowledge of the creator's work." *Le Moine v. Combined Commc'ns Corp.*, 95 C 5881, 1996 WL 332688, at *4 (N.D. Ill. June 13, 1996) ("Where there is a 'close relationship' or 'nexus' between the alleged copier and the individual possessing knowledge of the creator's work, a reasonable probability of access may be inferred by the trier of fact."); *Meta-Film Associates, Inc. v. MCA, Inc.,* 586 F. Supp. 1346, 1357 (C.D. Cal. 1984).

Based on the nature and timing of the collaboration between Gaynor, Blair, and Gaga, a reasonable juror could find that there exists "nexus" between the parties and that therefore the Defendants had an opportunity to view the Francescatti Song. The nexus between the parties in

this case may be proved through a channel of communication. *See Repp v. Webber*, 132 F.3d 882, 887 (2d Cir. 1997); *Sanford v. Columbia Broadcasting Sys.*, Inc., 594 F. Supp. 711 (N.D. Ill. 1984). Although the parties dispute that Gaynor ever came into direct contact with Gaga, it is undisputed that Gaynor worked on the Francescatti Song before he collaborated with Blair on material for Gaga's *Born This Way* album and that Gaynor and Blair received credit for contributions to the same album.

If a channel of communication between the person to whom the work is submitted (here, Gaynor) and the person who ultimately created the allegedly infringing work (here, Gaga) and "such channel involves a number of different people, each of whom (other than the original person to whom plaintiff submitted the work) denies knowledge of the work," access is a reasonable, not a bare possibility. *Nimmer* § 13.02[A]. Furthermore, in a previous case where even the *existence* of such a channel of communication was denied by the defendant, but supported by some evidence from the plaintiff, we denied summary judgment based on our finding that plaintiff had established a reasonable possibility of access. *Sanford*, 594 F. Supp. at 713 (finding a reasonable possibility of access despite defendant CBS denying plaintiff's allegations that he submitted his song to CBS's office in Illinois, which then allegedly sent the tape to the CBS's Los Angeles office at a time when CBS allegedly knew that defendant Michael Jackson was in contact with CBS and looking for a song to perform with Paul McCartney).

Here, Francescatti has come forward with facts concerning a channel of communication between Gaynor, Blair, and Gaga that surpasses the threshold of "mere conjecture or speculation," thus giving rise to a reasonable possibility of access. Judges in this district have found access based on similar facts. In *Allen*, although (1) the creators of the Destiny Child's

Song ("DC Song") denied under oath that they did not receive a copy of the plaintiff's song from any source, and (2) a third party—whom the plaintiff had allegedly given his song and who later created a remix of the DC Song—denied giving the creators a copy of the plaintiff's song, it was undisputed that "sometime in 2000, 2001, or 2002," the creators came into contact with the third party. *Allen,* 2009 WL 2178676, at *6. "It was therefore possible for [the third party] to have provided a copy of [the plaintiff's song], or a key part thereof" to the creators of the DC Song before the songwriter defendants wrote and recorded the DC song in 2004. *Id.*; *see also Le Moine*, 1996 WL 332688, *4 (finding that although the defendants never saw the plaintiff's compositions this fact did not foreclose the reasonable probability that the defendants had access to the creative components of the plaintiff's work through their discussions with third parties).

Defendants claim that *Allen* in fact supports Defendants' position because whereas in *Allen* "it was undisputed that the third party actually *came into contact with* the defendants," here, it is undisputed that the third party, Gaynor, "*never came into contact with* Gaga." (Def.'s Reply 20 (emphasis added).) Defendants' application of *Allen* to the facts of this case misses the mark. Here, it is Blair who is the third party. Gaynor worked on the Francescatti Song before collaborating with Blair for the purpose of providing music to Gaga for the *Born This Way* album, and Blair worked with Gaga on the same album. (SOF ¶ 10; RSAF ¶¶ 1, 31.) Accordingly, as in *Allen*, it is reasonably possible for Blair to have provided the Francescatti Song to Gaga before the Gaga Song was published on April 23, 2011.

Furthermore, despite Defendants' statement to the contrary, it is not undisputed that Gaynor never came into contact with Gaga. (SAF ¶ 8; RSAF ¶ 8.) Whether there exists a direct nexus between Gaynor and Gaga depends on the credibility of the witnesses. Because courts are

-10-

constrained in making credibility determinations at the summary judgment stage, we hold that the factual question of access as it relates to a direct nexus between Gaynor and Gaga is material and disputed. *See Allen*, 2009 WL 2178676, at *7 (denying summary judgment because whether the plaintiff "has established a reasonable possibility of access is a close call, the resolution of which hinges entirely on the credibility of the witnesses"). Here, where Francescatti has attempted to impeach Defendants' credibility, whether Gaynor came into contact with Gaga and whether Gaga heard the Francescatti Song before the Gaga Song was published, remain disputed. (RSOF ¶¶ 13, 25, 115–118; SAF ¶¶ 1–4, 8, 10–11); compare *Selle*, 741 F.2d at 903 (finding that plaintiff was unable to raise more than a speculation that the Bee Gees had access to his song where the "extensive testimony of the defendants and their witnesses describing the creation process went essentially uncontradicted, and there was *no attempt even to impeach their credibility*") (emphasis added).

Defendants argue that because both Blair and Gaga deny knowledge of the Francescatti Song and Gaynor denies exposing both individuals to the song, Francescatti cannot avoid summary judgment merely by suggesting that Defendants' evidence may not be believed. (Def.'s Reply 19 (citing *Alvarez v. Industria del Amor*, 98 C 1851, 1999 WL 498610, at *3 (N.D. Ill. July 9, 1999). We agree. Francescatti, however, comes forward with more evidence than just "merely" suggesting that Defendants' evidence is not to be believed. Francescatti offers specific, undisputed evidence about Gaynor, Blair, and Gaga's collaboration on the *Born This Way* album and the sequence of events surrounding the creation of the Gaga Song before it was published in 2011.

To reach the conclusion that the Francescatti Song was available to Defendants, a trier of fact would have to (1) discredit the testimony of Gaynor, Blair, and Gaga that neither Blair nor Gaga received a copy of the Francescatti Song, (2) infer that Gaynor either gave the Francescatti Song to Gaga directly, or that he gave it to Blair and Blair then gave it to Gaga, and (3) discredit Gaga and RedOne's testimony that they independently created the Gaga Song. When the evidence is viewed in the light most favorable to Francescatti, as we must do in evaluating a motion for summary judgment, this chain of events is reasonably possible. *See Allen,* 2009 WL 2178676, at *7 (conducting a similar analysis and concluding that however attenuated plaintiff's theory of access, factual questions still must be presented to the trier of fact); *see also Gaste v. Kaiserman*, 863 F.2d 1061, 1067 (2d Cir. 1988) ("Although Gaste's theory of access relies on a somewhat attenuated chain of events extending over a long period of time and distance, we cannot say as a matter of law that the jury could not reasonably conclude that Kaiserman had access to the song through Lebendiger. Access through third parties connected to both a plaintiff and a defendant may be sufficient to prove a defendant's access to a plaintiff's work."). Francescatti has therefore established that, based on the nexus between the parties, Defendants had the reasonable opportunity to view Francescatti's work.[1]

---

[1] We reiterate that whether Defendants availed themselves of the opportunity to view the protected work is a question that goes not to the issue of access, but rather the ultimate issue of copying. *Nimmer* § 13.02[A]. At the summary judgment stage, Francescatti's burden is not to show that Gaga absolutely heard the Francescatti Song or that she absolutely had the opportunity to hear the song, but rather, to show with all factual inferences drawn in Francescatti's favor, that there is a genuine issue of material fact as to whether Defendants had the "reasonable opportunity" to hear the Francescatti Song before creating the Gaga Song. Whether Gaynor, Blair, and Gaga are credible witnesses would be a question of fact for the trier of fact to decide. *Allen,* 2009 WL 2178676, at *7.

Because a trier of fact could find that Francescatti has established a reasonable possibility of access based on the relationships and communications between the parties, she has come forward with "evidence which would establish a reasonable possibility that the complaining work was available to the alleged infringer." *Selle,* 741 F.2d at 901 (emphasis omitted). Defendants are therefore not entitled to summary judgment on these grounds.

### 2. Substantial Similarity

Although summary judgment is not favored on the question of substantial similarity in copyright cases, it is appropriate where no reasonable trier of fact could find substantial similarity in the protected expression of the disputed works. *Kouf v. Walt Disney Pictures & Television,* 16 F.3d 1042, 1045 (9th Cir. 1994); *FASA Corp. v. Playmates Toys, Inc.*, 869 F. Supp. 1334, 1353 (N.D. Ill. 1994). At the summary judgment stage, we are well-suited to determine whether a reasonable trier of fact could find that there is substantial similarity of protectable elements between the two songs. *Shaw v. Lindheim*, 919 F.2d 1353, 1361 (9th Cir. 1990); *Apple Computer, Inc. v. Microsoft Corp.*, 799 F. Supp. 1006, 1020 (N.D. Cal. 1992) order clarified, C-88-20149-VRW, 1993 WL 207982 (N.D. Cal. Apr. 14, 1993).

With regard to the degree of similarity that must be proved in this case, Defendants suggest that we apply the inverse ratio rule, in which weak evidence of access requires a higher standard of proof for similarity. (Def.'s Br. 6.) Because the Seventh Circuit has explicitly declined to endorse the inverse ration rule, we too decline to adopt this proposition. *Peters v. West*, 692 F.3d 629, 635 (7th Cir. 2012) ("Once a plaintiff establishes that a defendant could have copied her work, she must separately prove—regardless of how good or restricted the opportunity was—that the allegedly infringing work is indeed a copy of her original."). The

substantial similarity inquiry is independent of the access inquiry. Although evidence of striking similarity sometimes permits a finding of copying without proof of access, "it should be obvious that the converse proposition is not equally valid—because access without similarity cannot create an inference of copying, even massive evidence of access cannot by itself avoid the necessity of also proving the full measure of substantial similarity." *Nimmer* § 13.03[D]; *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 902 (9th Cir. 1987). Thus, regardless of the degree of access in this case, the substantial similarity analysis must be conducted independently.

Defendants assert that Francescatti's copyright claim fails to satisfy the substantial similarity requirement because (1) the two songs do not sound substantially similar, and (2) Francescatti's claims are based on nonprotectable elements.

### a. Overview of the substantial similarity standard

Substantial similarity is determined by inquiring: "(1) whether the defendant copied from the plaintiff's work and (2) whether the copying, if proven, went so far as to constitute an improper appropriation." *Atari, Inc. v. North American Philips Consumer Electronic Corp.,* 672 F.2d 607, 614 (7th Cir. 1982) (citing *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir. 1946)). Because experts consider substantial similarity to be one of the most difficult questions in copyright law, *Nimmer* § 13.03[A], we briefly review how substantial similarity fits into the broader copyright analysis.

> To prevail on a copyright claim, a plaintiff must prove (1) a valid copyright, and (2) illicit copying. To prove illicit copying, he must establish both (1) copying, and (2) unlawful appropriation. To establish copying, a plaintiff must show (1) access, and (2) substantial similarity between the works when compared in their entirety including both protectible and unprotectible material. Finally, to show unlawful appropriation (i.e., substantial similarity

as a matter of law), the plaintiff must demonstrate that the defendant's copying extended to the plaintiff's protectible expression.

*Stillman v. Leo Burnett Co.,* 720 F. Supp. 1353, 1358 (N.D. Ill. 1989) (internal citations omitted). The court in *Stillman* adds that "[a]t first blush, this framework appears circular: To prove copying, the plaintiff must prove substantial similarity; and to prove substantial similarity, he must prove copying." *Id.* at 1357. For the sake of clarity, we briefly discuss the dual usages of the terms "copying" as well as "substantial similarity." *See Zimnicki*, 2011 WL 5866267, at *2; *Runstadler Studios, Inc. v. MCM Ltd. Partnership,* 768 F. Supp. 1292, 1296 (N.D. Ill. 1991).

Copying as an element of a copyright claim refers to the ultimate legal issue of unlawful appropriation, *i.e.* whether the defendant violated the copyright laws by reproducing protectable expression from the plaintiff's work. *Stillman*, 720 F. Supp. at 1357; *see Rockford Map Publishers, Inc. v. Directory Serv. Co. of Colo., Inc.,* 768 F.2d 145, 149 (7th Cir. 1985). Copying as an element of substantial similarity, however, is limited to the purely factual issue of whether the defendant used the plaintiff's work as a starting point for his own. *Stillman*, 720 F. Supp. at 1357. Thus, a defendant who has copied as a factual matter may not have copied as a legal matter. *Id.* ("If a defendant has not copied something protected by the copyright laws—specifically, the plaintiff's expression of his ideas—then his copying will not subject him to liability.") (citing *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163–64 (9th Cir. 1977)). In other words, "a plaintiff must establish at least permissible copying as a prerequisite to proving illicit copying." *Stillman*, 720 F. Supp. at 1357.

Substantial similarity also has dual usages. When substantial similarity is used to determine copying as factual matter, it "can refer to the likeness between two works sufficient to

give rise to an inference, when supported by evidence of access, that the defendant took ideas from the plaintiff's work." *Stillman*, 720 F. Supp. at 1357; *see Selle*, 741 F.2d at 900–01. When substantial similarity is used to determine copying in the legal sense we inquire whether the defendant's work is substantially similar to the original elements of the plaintiff's work, such that there has been unlawful appropriation. *Zimnicki*, 2011 WL 5866267, at *3; *Stillman*, 720 F. Supp. at 1358. Substantial similarity thus relates to both the copying and unlawful appropriation prongs necessary to prove a copyright infringement.

### b. How to apply the substantial similarity test

Having discussed the substantial similarity standard within the larger copyright context, we now address the variety of approaches regarding its application. In *Arnstein*, the Second Circuit described the copying and unlawful appropriation requirements as a two-step inquiry, explaining that while dissection and expert testimony are proper under the first prong, copying, they are irrelevant under the second prong, unlawful appropriation, which is determined by the response of the ordinary observer. *Arnstein*, 154 F.2d at 468. Some courts have formulated this inquiry as the extrinsic-intrinsic test, including the Ninth Circuit, which we add has extensive experience with regard to the entertainment industry. *Murray Hill Publ'ns, Inc. v. Twentieth Century-Fox Film Corp.*, 361 F.3d 312, 318 (6th Cir. 2004); *Krofft*, 562 F.2d at 1164 (applying the extrinsic test to prove the first prong and the intrinsic test to prove the second prong). The Ninth Circuit has applied the extrinsic-intrinsic test to music copyright cases, *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000), as have other circuits, *see, e.g., Lil' Joe Wein Music, Inc. v. Jackson*, 245 F.App'x 873, 877 (11th Cir. 2007); *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731, 733 (4th Cir. 1990). The Seventh Circuit stated in *Atari*, however, that its

substantial similarity analysis "focuses on the second part of that test and the response of the 'ordinary observer.'" *Atari*, 672 F.2d at 614. This test "does not involve analytic dissection and expert testimony but depends on whether the accused work has captured the total concept and feel of the copyrighted work." *Id*. at 614.

The substantial similarity standard in this circuit has been said to be "somewhat nebulous." *Nash v. CBS, Inc.,* 704 F. Supp. 823, 826 (N.D. Ill. 1989). Some courts have stated that the confusion is due to the fact that in *Atari*, the two steps of analysis under the bifurcated test "ultimately merge into a single inquiry: whether a reasonable jury could find the competing designs substantially similar at the level of protected expression." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1224 n.5 (11th Cir. 2008); *Beal v. Paramount Pictures Corp*., 20 F.3d 454, 459 n.4 (11th Cir. 1994). According to courts in this circuit, however, the confusion concerns only the nature of the first prong, which "the Seventh Circuit has not clearly described." *Nash*, 704 F. Supp. at 826; *Stillman*, 720 F. Supp. at 1358 ("*Atari* creates obfuscation because it refers to substantial similarity in terms of [copying], but then sets forth the test necessary to establish [improper appropriation].").  In certain cases, it may initially appear that courts have perpetuated the *Atari* approach where in fact the two-part test has been recognized, but because copying has been conceded, courts have been able to "dodge the bullet" on the first prong. *See Nash*, 704 F. Supp. at 826 (recognizing the two-part test, but applying only the second prong—the ordinary observer test—because defendant in that case "agreed to assume 'copying' (as that term is used in the first prong of the 'substantial similarity' test)").

Regardless of the reason for the Seventh Circuit's approach in *Atari*, the court recently remarked that the "confusing" nomenclature is a "pseudo-conflict" because "the outcomes do not

-17-

appear to differ." *Peters*, 692 F.3d at 633–34. Fundamentally, "copyright infringement requires proof of the fact that "the two works share enough unique features to give rise to a breach of the duty not to copy another's work." *Id.* To make this determination, it plainly has been established that courts must assess two inquiries: 1) whether there is copying and, if copying is found, 2) whether there is unlawful appropriation. *JCW*, 482 F.3d at 914 (citing *Feist*, 499 U.S. at 361, 111 S. Ct. at 1296).

Given this well-established two-part inquiry, it appears that the root of the confusion surrounding the substantial similarity test in this case is not, fundamentally, the test *per se*, but rather the tests' emphasis, or lack thereof, on expert testimony. Defendants propose that we follow the *Atari* model, which relies predominantly on the ordinary observer test. (Def.'s Br. 6–7.) Francescatti, on the other hand, argues that the more appropriate test, given the complex nature of the computer-generated Gaga Song, is the extrinsic-intrinsic test, which places greater weight on analytical dissection and expert testimony. (Pl.'s Resp. 18–19.) She states that this case is distinguishable from other music copyright cases where a court can make a "side by side" comparison by listening to the music to determine total concept and feel because, here "[c]omputer generated EDM [electronic dance music] requires computer analysis." (Pl.'s Resp. 25.) Accordingly, Francescatti argues that expert testimony, through use of the extrinsic-intrinsic test, is essential in order to understand what protectable elements have been copied. (*Id.* at 19.)

Although the terminology surrounding the substantial similarity standard has been "surprisingly muddled," *Peters*, 692 F.3d at 633–34, the real confusion boils down to whether expert testimony may be relied upon in assessing similarity between two musical works. Thus, when the parties in this case advocate in favor of different tests, the practical implications of

these arguments concern whether we are permitted to take into account expert testimony. Under both tests, however, the Seventh Circuit has stated that expert testimony may be important at times in order to "educate the trier of fact." *Atari*, 672 F.2d at 618 n.12; *see Stillman*, 720 F. Supp. at 1359.

The question we are presented with in this case, then, is whether this musical copyright case warrants expert testimony.[2] Whether expert testimony is warranted in any given case depends on the nature of the allegedly infringing work. While simplistic works may be determined by the spontaneous response of the ordinary observer, more complex works may require expert testimony in order to help the trier of fact distinguish copied elements under the first prong of the analysis. Some of the most complicated material consists of computer-generated works. In a case involving computer programs, the Second Circuit declined to apply the ordinary observer test, stating that it "may well have served its purpose when the material under scrutiny was limited to art forms readily comprehensible and generally familiar to the average lay person." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992). The court granted discretion to the district courts "to decide to what extent, if any, expert opinion, regarding the highly technical nature of computer programs, is warranted in a given case." *Id*. It clearly indicated, however, that the court was not "disturbing the traditional role of

---

[2]We aim to shed light on this issue, recognizing that music copyright law's "fragmented application is proving troublesome for the music industry[.]" Tonya M. Evans, "Sampling, Looping, and Mashing...Oh My!: How Hip Hop Music is Scratching More Than the Surface of Copyright Law," 21 Fordham Intell. Prop. Media & Ent. L.J. 843, 848 (2011), *available at* http://works.bepress.com/tonya_evans/1.

lay observers in judging substantial similarity in copyright cases that involve the *aesthetic arts*, such as *music*, visual works or literature." *Id.* at 713–14 (emphasis added).

According to the Seventh Circuit, however, expert testimony could indeed be necessary for certain aesthetic arts. *Atari*, 672 F.2d at 619 ("Video games, unlike an artist's painting or even other audiovisual works, appeal to an audience that is fairly undiscriminating insofar as their concern about more subtle differences in artistic expression."). As discussed below, a varying degree of expert testimony has thus been applied to artistic works. We now address whether the Gaga Song—which although it does not involve source or object code, is computer-generated—is a sophisticated work that requires analytic dissection and expert testimony.

### c. Whether to apply expert testimony to determine substantial similarity between the musical works

Musical works have historically been treated as a "traditional" copyright matter, which meant that courts applied the ordinary observer standard, requiring little, if any, analytic dissection and expert testimony. *Nimmer* § 13.03[E][4]. The ordinary listener standard is derived from the reasonable person standard, which has been used in other areas of law, such as contracts, to determine whether a person has fallen below a minimum threshold of a particular social norm. *See Computer Assocs. Int'l*, 982 F.2d at 713. The reasonable person standard presupposes that there is a right and wrong way to carry out affairs. J. Michael Keyes, *Musical Musings: The Case for Rethinking Music Copyright Protection*, 10 Mich. Telecomm. Tech. L. Rev. 407, 432 (2004), *available at* http://www.mttlr.org/volten/Keyes.pdf. Music, however, is inherently subjective; there is no accepted social norm that provides a meaningful standard on how music would be perceived by a reasonable listener. *Id*. Consequently, some courts have

recently found that the trier of fact is not equipped to make the determination. *See Dawson*, 905 F.2d at 735 (stating with regard to the musical works at issue, "[o]nly a reckless indifference to common sense would lead a court to embrace a doctrine that requires a copyright case to turn on the opinion of someone who is ignorant of the relevant differences and similarities between two works").

Exacerbating the difficulty with the inherently subjective ordinary observer standard is the dramatic degree to which the music industry has evolved over the course of the last century. *See* Keyes, *supra*, at 430; John R. Zoesch III, *"Discontented Blues": Jazz Arrangements and the Case for Improvements in Copyright Law*, 55 Cath. U. L. Rev. 867 (2006). When the first music copyright cases were reported, *see Jollie v. Jaques*, 13 F.Cas 910 (C.C.S.D.N.Y. 1850), the music industry revolved around printed sheet music. It thus made sense for Congress and courts to treat music like other works. Since then, however, technological and social developments have significantly altered the musical landscape. Keyes, *supra*, at 414. In light of these challenges, some experts now argue that the ordinary observer standard is fundamentally out-of-date and no longer applicable to the modern day music industry. *Id*. at 419; Alice J. Kim, *Expert Testimony and Substantial Similarity: Facing the Music in (Music) Copyright Infringement Cases*, 19 Colum.-VLA J.L. & Arts 109, 125 (1995).

Several concerns arise in this case that lead us to conclude that expert testimony is warranted. Given how increasingly complex the music industry has become since the ordinary observer was first established, we share the concern raised in the literature that a court's "lay ear" may not be able to adequately assess the similarities between musical works. *See, e.g.*, Keyes, *supra*, at 434–35; Zoesch, *supra*, at 903; Kim, *supra*, at 125. In this case, according to

Francescatti's expert Colin McGeehan, the Gaga Song was constructed with a Digital Audio Workstation ("DAW"), (RSAF ¶ 18), which can create "hundreds if not thousands of sounds, especially when you manipulate them" (RSOF ¶ 84). Moreover, in contrast to the Gaga Song that was created in large part on computers that utilize software to record and manipulate sounds, the Francescatti Song was composed primarily by live musicians playing live instruments in the recording studio. (SAF ¶ 18; Shehab Report at 2, 7–10.) Therefore, Dr. Yasser Shehab explains, "the similarities may not be readily apparent, especially to the untrained ear," and a determination as to similarity requires analysis beyond just listening to the two songs. (Shehab Report at 2, 7–11.) Francescatti asks that we take into account copyright infringement reflective of new technological music and recognize the ownership rights of the creator of music segments "that have been misappropriated by another, manipulated and inserted into a derivative sound recording." (Pl.'s Resp. 2.)

A court in this district previously used expert testimony where the infringing work was of a different nature than the copyrighted work. *See FASA Corp. v. Playmates Toys, Inc.*, 912 F. Supp. 1124, 1169 (N.D. Ill. 1996), vacated in part on other grounds, 108 F.3d 140 (7th Cir. 1997) ("The issue of whether Playmates has illegally copied FASA's protectible designs is made even more difficult than usual because the allegedly infringing items are in a different medium and are of a different nature than the copyrighted item."). Moreover, because "[a]n author has the exclusive right to produce derivative works based on the original work," as the Seventh Circuit acknowledged in *Atari*, "the judicially created ordinary observer test should not deprive authors of this significant statutory grant merely because the technical requirements of a different medium dictate certain differences in expression . . . in some cases it may be important to

-22-

educate the trier of fact as to such considerations in order to preserve the author's rights under the Copyright Act." *Atari,* 672 F.2d at 618 n.12 (internal citations omitted). Expert testimony may therefore be helpful in focusing the court on the similarities between different mediums.[3]

The concerns we have raised with the ordinary observer standard as they relate to music copyright cases can be ameliorated with the use of expert testimony in this case. Due to the difficulty we face in ascertaining the alleged similarities between the songs, expert testimony is warranted in order to determine whether objective copying has occurred under the first prong of the substantial similarity analysis. Specifically, because of the different musical genres we are presented with and the fact that the Gaga Song is computer-generated, our lay ears cannot be relied upon to determine whether there has been copying. Even Defendants, who otherwise advocate in favor of the *Atari* ordinary observer standard, recognize that expert testimony "may be useful to the court in evaluating substantial similarity." (Def.'s Reply 7.)

Some experts go so far as to argue that the ordinary observer "total concept and feel" standard should be altogether abandoned since it promotes an "abdication of analysis," which "subvert[s] the very essence of copyright, namely the protection of original *expression*." *Nimmer* § 13.02[A][1][c]. Although courts have recognized that expert testimony is at times necessary to determine copying, attempts to entirely do away with the ordinary observer test with regard to musical works have been rejected. *Baxter v. MCA, Inc.,* 812 F.2d 421, 422 n.2 (9th Cir. 1987)

---

[3] "If because of the camouflage of a different medium, the lay audience loses sight of the similarity, the fact remains that the plaintiff may have suffered a substantial appropriation of the fruits of his labor. In fact, the writer's loss is even greater when the appropriation is into a different medium, for here his work is made available to a new, untapped market, whereas if the infringing work were limited to the original medium, it would only attract the same people who already had an opportunity to purchase the plaintiff's work." *Nimmer* § 13.03[e][2].

(declining to consider plaintiff's argument that the "lay audience" test is unsatisfactory "in technical fields such as music because an infringer can easily deceive the unsophisticated by immaterial variations in the copyrighted work"). The ordinary observer standard is still relevant for the purpose of determining whether the similarities between the two songs extend to protectable expression such that there is unlawful appropriation.

We address Defendants' argument that "the legal standard does not change with the musical genre"; electronically-created music "still consists of melody, harmony, rhythm and lyrics, even if created electronically." (Def.'s Reply 1.) We emphasize that we are not applying a different substantial similarity analysis. Rather, we are stating that the songs in this case are sufficiently complex, especially given the use of computer technology, to warrant expert testimony within the well-established, bifurcated substantial similarity analysis.[4]

---

[4]On May 30, 2014, we granted Defendants' motion to file notice of supplemental authority. (Dkt. No. 185.) In a non-binding motion to dismiss decision, *Edwards v. Raymond*, a Southern District of New York judge found that the songs were not substantially similar as a matter of law. *Edwards,* 13 c 7985, 2014 WL 2158932, at *6 (S.D.N.Y. May 23, 2014). Defendants argue that, like the judge in that case, we should also apply the ordinary observer test: "[N]o expert analysis . . . may save the plaintiff's claim." (Def.'s Supp. Auth. Mot. at 1.) We agree with Plaintiff, however, that "the 'overall concept and feel' standard . . . does not [necessarily] stand for the proposition that expert testimony is not material to the question of substantial similarity." (Pl.'s Resp. to Def.'s Supp. Auth. Mot. at 1–2.) Although expert testimony was not at issue in the *Edwards* case, the court acknowledged that the Second Circuit has at times applied a "more discerning" analysis. *Edwards*, 2014 WL 2158932, at *6 (citing *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 65 (2d Cir. 2010) (acknowledging "that there can be instances of alleged copyright infringement where the question of substantial similarity cannot be addressed without the aid of . . . expert testimony")); *see Computer Assocs. Int'l*, 982 F.2d at 713 ("In making its finding on substantial similarity with respect to computer programs, we believe that the trier of fact need not be limited by the strictures of its own lay perspective."). For the reasons discussed above, we find that the question of substantial similarity between the Francescatti and Gaga songs "cannot be addressed without the aid of . . . expert testimony" in this instance. *See id.*

Although we find that the songs are complex enough to warrant expert testimony, we are not suggesting that courts apply a "more discerning observer" test to music copyright cases, in which the "ordinary observer" standard would be determined not by a lay listener, but rather by a choral director, for instance. *Dawson*, 905 F.2d at 735 (suggesting that the substantial similarity analysis must consider the intended audience of the plaintiff's work, such as having children's toys judged by a juvenile standard, software by the computer literate, and musical arrangements by choral directors). According to the Fourth Circuit, "departure from the lay characterization is warranted only where the intended audience possesses 'specialized expertise.'" *Id.* at 737. At issue in *Dawson* were spiritual arrangements, which the court stated were likely "purchased primarily by choral directors who possess specialized expertise relevant to their selection of one arrangement instead of another." *Id.*; *see Odegard Inc. v. Safavieh Carpets*, *Inc.*, 398 F. Supp. 2d 275, 281 (S.D.N.Y. 2005) (concerning expensive carpets that were purchased by sophisticated consumers). In this case, however, no evidence has been presented to suggest that the listeners of the two songs consist of those with specialized expertise. Thus, although we welcome expert testimony for the purpose of assessing copying, we are not applying the "more discerning observer" standard.

### d. Application of the extrinsic-intrinsic test

Having discussed the substantial similarity standard and the fact that expert testimony is appropriate in this case, we apply the extrinsic-intrinsic test as set forth in *Stillman*. *Stillman*, 720 F. Supp. at 1357–59 (citing *Krofft*, 562 F.2d 1163–64). In *Stillman*, the court explained that the extrinsic prong "permits a plaintiff to prove copying by showing, through analytic dissection and (if necessary) expert testimony, that the similarities between the two works—when viewed in

terms of their protectible and nonprotectible elements—are so substantial as to warrant a finding that the defendant usurped, at least, the plaintiff's ideas." *Id*. (citing *Arnstein*, 562 F.2d at 1164). The intrinsic prong, however, "addresses the indeterminate boundary between ideas and their expression." *Stillman*, 720 F. Supp. at 1359. The inquiry is whether an ordinary observer would find that "the accused work has captured the 'total concept and feel' of the copyrighted work." *Id. (citing Atari,* 672 F.2d at 614; *Krofft,* 562 F.2d at 1164; *Arnstein,* 154 F.2d at 468). This inquiry, however, "fails to account for the possibility that the similarity of expression may fall within the category of what is known as nonprotectible expression." *Stillman*, 720 F. Supp. at 1359. Therefore, the next step is to determine whether "the similar response arises solely from the similarities of the nonprotectible elements of the two works." *Id*.

In this case, to establish substantial similarity under the extrinsic-intrinsic test, Francescatti must first show that Defendants copied elements of her song, and then that the copying extends to protected expression. Although we find that Francescatti has established copying under the extrinsic test, she has failed to meet the requirements of the intrinsic test. No reasonable trier of fact could find under the ordinary observer standard that the allegedly infringing elements of the Gaga Song capture the total concept and feel of the Francescatti Song. Even if the songs did share a similar total concept and feel, however, such similarities would arise from unprotectable elements.

*I) Extrinsic test: copying in the factual sense*

"The extrinsic test considers whether two works share similarity of ideas and expression as measured by external, objective criteria." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir.

2004). Under this prong of the substantial similarity analysis, experts are equipped to assist the trier of fact in determining whether there has been copying of any kind, protectable or not protectable. *Stillman,* 720 F. Supp. at 1358. The copying must "warrant a finding that the defendant usurped, at least, the plaintiff's *ideas*." *Id*. at 1358–59 (citing *Krofft*, 562 F.2d at 1164). Thus, under the extrinsic test, we compare the alleged similarities of both songs' protectable and unprotectable material.

Although courts have declined to outline "a uniform set of factors," *Swirsky*, 376 F.3d at 849, the threshold for establishing copying is low, *Krofft*, 562 F.2d at 1166. Because the only issue under the extrinsic test is idea similarity, and because in most copyright litigation, the plaintiff only files an action where there is at least a colorable claim as to substantial similarity of ideas, it is rare that a court has the power to rule for the defendant in advance of trial on the extrinsic prong. *Nimmer* § 13.03[E][3][b][I]. "Under Krofft, *any* idea that is found in both plaintiff's and defendant's works is sufficient to satisfy the extrinsic test." *Id*.; *Krofft*, 562 F.2d at 1166. There need not be a comparison of *the* idea in each work. *Nimmer* § 13.03[E][3][b][I].

With regard to musical composition, "a single musical note would be too small a unit to attract copyright protection (one would not want to give the first author a monopoly over the note of B–flat for example)." *Swirsky*, 376 F.3d at 849. Courts have also found that a three-note segment is insufficient to sustain a claim for infringement. *Newton v. Diamond*, 388 F.3d 1189 (9th Cir. 2004) (finding no substantial similarity where only a three-note segment, played over a lower octave, was at issue); *Allen,* 2009 WL 2178676, at *12 (holding that a three-note phrase was "unprotectable as a matter of law"). However, "[a]n arrangement of a limited number of notes can [indeed] garner copyright protection." *Swirsky*, 376 F.3d at 851–52 (citing *Elsmere*

-27-

*Music, Inc. v. Nat'l Broad. Co.*, 482 F. Supp. 741, 744 (S.D.N.Y. 1980), which found that four

notes were substantial enough to be protected by copyright); *Santrayll v. Burrell*, 91 CV 3166,

1996 WL 134803, at *2 (S.D.N.Y. Mar. 25, 1996) (finding that the repetition of the word

"uh-oh" four times in a distinctive rhythm for one measure was sufficiently original to render it

protectable under the copyright laws).

Here, the two songs contain more similarities than just a three-note segment. First, the

Francescatti Song shares a similar title to the Gaga Song. Second, both songs also include the

repetitive use of the word "Juda" or "Judas" as a refrain, which is done in a monotone manner

throughout the song. (RSOF ¶ 68.)

Third, Francescatti argues that the breakdown sections share several similarities. (Pl.'s

Resp. 24–25.) The first element that her experts identify is the locations of the breakdowns. We

find that the locations, however, are undisputedly dissimilar. The breakdown occurs in the

Francescatti Song between 2:05—2:25, but in the Gaga Song between 2:42—3:10. (Shehab Rep.

13.) Another element is that both breakdown sections begin with four 16th notes. (Cockrell

Dep. 86:6–10.) With regard to the "texture" of the breakdown sections (SOF ¶ 83), the experts

did not identify similarities in terms of the melody or harmony. (McGeehan Dep. 165:9–166:3.)

The added instrumentation halfway through the breakdowns is also different; the Francescatti

Song adds electric violin and bass guitar whereas the Gaga Song adds only spoken vocals. (*Id*.

166:9–19.)

According to McGeehan, both breakdown sections "end with a subdivided rhythm

(subdivision of the beat) which transitions to a new section that includes strings playing 16th

-28-

notes." (McGeehan Decl. at 9.) He adds, however, that only four of the 16 pitches are the same. (McGeehan Dep. 184:9–17.) Moreover, the Francescatti Song transition features bass drums, while the Gaga Song transition features a keyboard. (McGeehan Rep. 9, similarity no. 5.) Lastly, although a glissando appears at measure four, beat four of both songs, it is a bass glissando in the Francescatti Song and a vocal glissando in the Gaga Song. (RSOF ¶ 91.)

Thus, the only similarity between the songs' breakdowns is that both begin with four 16th notes.

With respect to the melodies, we start by addressing the fact that McGeehan applied five alterations to demonstrate similarity. (*Id.* ¶ 49; Def.'s Br. 14.) We may not compare the melodies in their altered states. "Substantial similarity may not be shown by an analysis that alters the actual sequence or construction of plaintiff's work in order to achieve a juxtaposition that makes for greater similarity with defendant's work." *Warner Bros., Inc. v. American Broad. Cos.*, 654 F.2d 204 (2d Cir. 1981) (internal quotes omitted); *see Trousseau Monogram Corp. v. Saturday Knight Ltd.*, 16 U.S.P.Q.2d 1079, 1080 (S.D.N.Y. 1990). The correct approach may not "divorce pitch sequence and rhythm from harmonic chord progression, tempo, and key[.]" *Swirsky*, 376 F.3d at 847–48 ("It is these elements that determine what notes and pitches are heard in a song and at what point in the song they are found. To pull these elements out of a song individually, without also looking at them in combination, is to perform an incomplete and distorted musicological analysis."). In *Johnson*, the First Circuit affirmed the district court's grant of summary judgment where it rejected the conclusions of plaintiff's expert where he had to apply a "series of [] alterations to the plaintiff's melody," including altering the rhythm and adding a note, in order to make it sound like defendant's song. *Johnson v. Gordon*, 409 F.3d 12,

21–22 (1st Cir. 2005). Here, McGeehan also altered the rhythm and dropped notes. (SOF ¶ 49.) Thus, when comparing the similarity of the melodies, we do not consider them in their altered state.

We find that the melodies are not similar. Most of the notes are different and there are many differences between their intervals. Additionally, the string part in the chorus of the Francescatti Song and the vocal part in the chorus of the Gaga Song are not similar. Lastly, the monotone pitch in both songs is different. According to Cockrell, the melody of the first verse of the Francescatti Song is not sung entirely on the same pitch whereas the first verse of the Gaga Song is sung entirely on the same pitch. (*Id.* ¶ 79.) Moreover, the rhythmic durations of the pitches in the first verse of both songs and the pitches themselves are different. (*Id.* ¶¶ 80–81.) The differences so outweigh the purported similarities between the melodies that they cannot be said to be even remotely similar. *See Johnson*, 409 F.3d at 22.

Although Francescatti does not allege many similarities between the two songs, she alleges more similarities than a three or four-note segment. A copied portion, which is "relatively small in proportion to the entire work" can give rise to substantial similarity "if qualitatively important." *Baxter*, 812 F.2d at 425. Here, Dr. Dale Cockrell testified that "although the sounds are different in some aspects, there are a number of noteworthy similarities that collectively support my conclusion that a high degree of substantial similarity exists between these works." (RSOF ¶ 41.) In light of the low threshold for the extrinsic test, we find that the aforementioned similarities between the songs give rise to a question of fact as to whether Defendants copied Francescatti's work. A reasonable trier of fact could find that Francescatti has

proven copying under the extrinsic test given the similar titles, repetition of the title in the songs' lyrics, and the similarity between the breakdown sections.

*ii) Intrinsic test: copying in the legal sense*

*a) Overview*

Two well-established tenants of copyright law must be upheld under the intrinsic ordinary observer test. First, the Copyright Act does not protect ideas, but only the particular expression of an idea. *Hobbs v. John*, 722 F.3d 1089, 1094 (7th Cir. 2013) (citing *Atari*, 672 F.2d at 615); *Feist*, 499 U.S. at 349–50, 111 S. Ct. at 1290. Second, even at this level of particular expression, the Copyright Act does not protect elements "that are so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another." *Hobbs*, 722 F.3d at 1095 (citing *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 929 (7th Cir. 2003)). Thus, even if a similar idea exists between the works, there has been no infringement unless substantial similarity is also found in the original expression of that idea. *Stillman*, 720 F.2d. at 1358 ("[T]o show unlawful appropriation, (i.e., substantial similarity as a matter of law), the plaintiff must demonstrate that the defendant's copying extended to the plaintiff's protectible expression."). We therefore address under the intrinsic prong of the substantial similarity analysis whether a reasonable trier of fact could find that evidence of factual copying extends to similarity of 1) expression 2) that is protected.

Summary judgment is appropriate under the intrinsic test where the similarity between the works concerns only noncopyrightable elements or where no reasonable trier of fact could find that the works are substantially similar. *Allen*, 2009 WL 2178676, at *8 (citing *Herzog v. Castle*

*Rock Entm't*, 193 F.3d 1241, 1247 (11th Cir. 1999)); *See v. Durang*, 711 F.2d 141 (9th Cir. 1983) (finding that a court can rule for a defendant on a motion prior to trial if the dissimilarity of expression between the two works is sufficiently great). The intrinsic test "is uniquely suited for determination by the trier of fact" so that an appellate court "must be reluctant to reverse." *Krofft,* 562 F.2d at 1166. The infringement of expression occurs when "the ordinary observer, unless he set out to detect the disparities [in the works], would be disposed to overlook them, and regard [the works'] aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960). As such, the intrinsic test precludes reference to objective criteria and expert testimony, and instead requires an inquiry into whether an ordinary observer experiencing the two works would conclude that "the accused work has captured the 'total concept and feel' of the copyrighted work." *Atari,* 672 F.2d at 614 (quoting *Roth Greeting Cards v. United Card Co.,* 429 F.2d 1106, 1110 (9th Cir. 1970)); *see also Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 939 (7th Cir. 1989); *Krofft,* 562 F.2d at 1164; *Arnstein,* 154 F.2d at 468.

Because we do not rely on expert testimony to determine similarity of expression under the intrinsic test, we give no weight to the opinion of Francescatti's expert, Shehab, who states that the songs would not sound similar to "an average listener or music consumer not trained in music." Shehab Dep. 53:3–54:20. Because Francescatti is also a musician, we do not give weight to her opinion that people not trained in music would not hear the similarities of the songs. (Francescatti Dep. 27:18–24, 101:1–5, 104:24–105:5.)[5] Defendants have failed to present

---

[5] In an email to her parents and siblings on August 3, 2011, Francescatti stated, "While the songs don't sound the same, musicologists have found substantial similarities between '*Juda*' and '*Judas*.'" (Francescatti Dep. 27:18–24.) Francescatti later explained in her deposition that what she meant was that the songs "don't sound the same to the people I'm writing to," including

evidence that Francescatti is competent to speak on behalf of the average listener. (Pl.'s Resp. 29.)

To determine whether the alleged infringing work has captured the total concept and feel of the copyrighted work under the ordinary observer test, courts make "side-by-side . . . comparisons of works to determine similarity." *Craig*, 1999 WL 412581, at *4 (citing *Wildlife Express*, 18 F.3d at 506–07); *Atari*, 672 F.2d at 619. Where the works are musical, a court compares them by listening to the music and reviewing the transcriptions of the music to determine whether a reasonable juror could hear the similarities between the songs. *See, e.g.*, *Lil' Joe Wein Music*, 245 F.App'x at 880 (granting summary judgment for defendant in part because "the 'average lay observer' would not confuse the two works"); *Johnson*, 409 F.3d at 22 n.6 ("[I]t is undisputed that the two musical segments, as written, do not sound alike and would not sound alike to an ordinary observer.").

Courts have applied a variety of approaches when comparing the works. *Nash*, 704 F. Supp. at 826 ("Because 'unlawful appropriation' can be such an elusive concept, courts have suggested numerous approaches by which to compare a copyrighted work and allegedly infringing material."). Defendants argue that we must determine the total concept and feel of the songs based on an ordinary observer's spontaneous response. (Def.'s Reply 6.) This assessment must be made, however, after filtering out the unprotectable elements, such as musical ideas and unoriginal musical expression. (*Id.*; Def.'s Br. 7.) While Francescatti acknowledges that

---

her family members, because "they're not musicians." (Francescatti Dep. 101:1–5, 104:24–105:5.) Although Francescatti disputes this characterization, the evidence she cites does not rebut the characterization. (*See* RSOF ¶ 35 (citing Francescatti Dep. 100:23).)

copyright protection only extends to protectable expression, she does not suggest that we apply the filtration approach when comparing the works. (Pl.'s Resp. 16–28.) The answer to this question—whether we should factor out the unprotected expression before or after comparing the similarity of the works—requires some explanation. We therefore briefly review the filtration method that Defendants propose.

Under the filtration approach, the court first filters out the unprotectable elements before determining the total concept and feel of the works. *Cooling Sys. & Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 493 (9th Cir. 1985) (citation omitted) ("[W]hat is important is not whether there is substantial similarity in the total concept and feel of the works, but whether the very small amount of protectible expression in [plaintiff]'s catalog is substantially similar to the equivalent portions of [defendant]'s catalog."). *Cooling Systems* involved a radiator parts catalog, but the filtration method was later applied to another "functional work:" computer programs. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994) (applying the filtering test and rejecting plaintiff's requests that comparison take place between the computer programs as a whole, rather than with an analytically dissected distillation). A later Ninth Circuit ruling, however, retreated from its holding in *Cooling Systems* with respect to artistic works. *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 321 (9th Cir. 1987) (holding *Cooling Systems* inapplicable to artistic works, and that even uncopyrightable material could be considered in evaluating substantial similarity); *Cory Van Rijn, Inc., v. California Raisin Advisory Board,* 697 F. Supp. 1136, 1140 (E.D. Cal. 1987) ("[N]ot persuaded" by defendant's filtering argument, the court instead applied *Krofft*.).

Nonetheless, the filtering approach has been applied to a variety of nonfunctional works, including those that are aesthetic in nature. *Mattel, Inc. v. MGA Entm't, Inc.,* 616 F.3d 904, 907 (9th Cir. 2010) (finding that the court below erred by failing to filter out the unprotected elements before applying the substantial similarity test for fashion dolls); *Shaw,* 919 F.2d at 1361 (applying the filtering approach to two literary works), *but see Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442–43 (9th Cir. 1991) (limiting *Shaw* to literary works and affirming summary judgment on competing "Man in the Moon" masks for lack of substantial similarity); *Nash,* 704 F. Supp at 826 (applying the filtering approach to determine whether a television series infringed on the copyright of a copyrighted story). Moreover, courts in the Seventh Circuit have adhered at times to the filtering approach for musical copyright works. *See Hobbs v. John*, 12 C 3117, 2012 WL 5342321, at *4–7 (N.D. Ill. Oct. 29, 2012) (filtering out the unprotectable elements before comparing the total concept and feel of the songs' lyrics); *Peters*, 776 F. Supp. 2d at 751–52 (same); *Allen,* 2009 WL 2178676, at *11–12 (applying the filtering method to lyrics and a three-note phrase).

At other times, courts in the Seventh Circuit, as well as the Ninth Circuit, have said that the unprotectable elements must merely be identified, but not necessarily filtered out. *Dream Games of Ariz., Inc. v. PC Onsite,* 561 F.3d 983, 988–89 (9th Cir. 2009) (approving jury instructions that appropriately identified the unprotectable elements of plaintiff's work, while allowing the jury to inspect the work as a whole); *FASA,* 869 F. Supp. at 1353 ("[B]efore the [robot-like battle machine toys] can be considered as a whole under the intrinsic test, the unprotectable elements have to be identified, *or* filtered.")(emphasis added).

-35-

And still another approach has been taken by a judge in this district who found that a total concept and feel determination must be made with regard to the works as a whole and then, only if such similarity is found, should the trier of fact determine whether the similarity arises from protectable expression. *Stillman*, 720 F. Supp. at 1359. In other words, only after determining that an ordinary observer, when considering both protectable and unprotectable elements, could find that the accused's work has captured the total concept and feel of the copyrighted work's expression, should the trier of fact consider whether that similarity in expression arises from protectable elements such that there is unlawful appropriation. *Id*.[6]

This debate, according to the Seventh Circuit, is much ado about nothing so long as the court makes a finding as to protectable expression. Copyright infringement requires proof of the fact that "the two works share enough unique features to give rise to a breach of the duty not to copy another's work." *Peters*, 692 F.3d at 633–34. Fundamentally, the intrinsic test must address the fact that copyright protection only extends to 1) expression 2) that is original. *Feist*, 499 U.S. at 361; 111 S. Ct. at 1296. Filtering need not necessarily happen as the first step under the intrinsic analysis, however, in order to uphold these two tenants of copyright law. In *Hobbs*, the Seventh Circuit separated out the analysis by first discussing the elements in terms of their expression and then discussing the elements in terms of their originality. *Hobbs*, 722 F.3d at 1095 ("Hobbs's first four allegedly similar elements are expressed differently in [the two songs].

---

[6]In *Nash v. CBS, Inc.*, 704 F. Supp. 823 (N.D. Ill 1989), the court declined to apply the "total concept and feel" standard, explaining that doing so would require the court to "consider similarities between the works in their entirety, including their unprotected portions." In that case, however, the issue was not whether to filter out the unprotectable elements before or after a determination as to similar expression, but whether to *ever* filter out the unprotectable elements.

And the remaining similar elements are rudimentary, common-place, standard, or unavoidable in popular love songs."). Originality therefore may be determined after similarity of expression.

Consistent with Seventh Circuit authority, we decline to filter out the unprotectable elements before assessing the similarity of the songs' expression. In this case, we will be assisted in determining the factual issue of copying if both works are first compared in their entirety without filtering out the unprotected elements. "[A]n initial holistic comparison may reveal a pattern of copying that is not obvious when only certain components are examined." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 841 (10th Cir. 1993) (comparing computer software).

> We acknowledge that unprotectable elements of a program, even if copied verbatim, cannot serve as the basis for ultimate liability for copyright infringement. However, . . . [t]he fact that non-protectable elements of the original program were also copied, although it cannot be the basis for liability, can be probative of whether protected elements were copied. That is because, in certain situations, it may be more likely that protected elements were copied if there is evidence of copying among the unprotected elements of the program.

*Id*. at 832 n.7.

Moreover, it is important to compare works in their entirety in cases where copying has not been conceded. *Id*. Where copying has been conceded, which often happens in software infringement actions, "the matter at issue . . . is actionable similarity, rather than copying as a factual matter." *Nimmer* § 13.03[F]. Where a factual issue is presented, however, "filtration may not be the optimal method of determining probative similarity." *Id*. Here, where copying

-37-

has not been conceded, we decline to first extract the unprotected elements, which could "deprive [us] of probative, and potentially essential, information." *Gates Rubber Co.*, 9 F.3d at 832 n.7. Rather, we first assess the similarity of expression before determining whether that similarity arises from unprotectable elements.

### b) Application of the ordinary observer test

#### i. There is no similarity of expression

When assessing the songs' expression, we keep in mind that substantial similarity may arise between the works as a whole and between their individual elements if such elements are qualitatively important or give rise to a unique combination. *See Atari*, 672 F.2d at 619; *Durang*, 711 F. Supp. at 143 (stating that the district court properly compared the plays "as a whole" in addition to considering the alleged similarities individually); *Feist*, 499 U.S. at 362; 111 S. Ct. at 1296. We therefore first evaluate the two songs in their entirety, considering both protectable and unprotectable elements, in order to determine whether an ordinary observer would find that the Gaga Song has captured the total concept and feel of the Francescatti Song. Simply listening to the songs, as the law requires, reveals their utter lack of similarity. Before we reviewed the experts' submissions, we were unable to make the distinctions that Francescatti is asking us to make. We agree with Defendants that the songs do not have common lyrics, the themes are different, and they do not sound at all alike musically. (Def.'s Br. 1.) Even Francescatti agrees that her song is "more lyrical, slower in tempo, and is a recorded live performance by its composer" whereas the Gaga Song is "an EDM sound recording created with synthesized sounds and other pieces of digital audio files." (Pl.'s Resp. 19–20.) Thus, we find the similarity of

expression to be, quite clearly, "totally lacking." *Baxter*, 812 F.2d at 423 (citing the district court).[7] The Francescatti Song and Gaga Song are so utterly dissimilar that reasonable minds could not differ as to a lack of substantial similarity between them.

Even though we find that the songs, taken as a whole, do not infringe upon Francescatti's copyright, the question remains as to whether individual elements of expression have been copied. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 825 (9th Cir. 2002). A copied portion, which is "relatively small in proportion to the entire work," can still give rise to substantial similarity "if qualitatively important." *Baxter*, 812 F.2d at 425. To be qualitatively important, these similarities must be more than "cosmetic similarities." *See Peters*, 692 F.3d at 636 (not finding substantial similarity where the songs' hooks, their shared title, and their references to Kate Moss were considered "only small cosmetic similarities"). Accordingly, we next assess, from the perspective of an ordinary observer, whether the elements that we identified under the extrinsic test—the songs' titles, the repetition of the titles in the lyrics, and the four 16th notes that propel the breakdown sections—are substantially similar in terms of their expression.

No reasonable fact finder could detect similarities between the expression of the repeated words, "Juda" and "Judas," in the lyrics. Their monotone melody does not sound similar. And although we find that the songs share similarities in terms of their titles and the four 16th notes,

---

[7]This case is unlike *Baxter* in which the Ninth Circuit overruled the district court's finding that similarity was "totally lacking" because it determined that reasonable minds could differ as to the substantial similarity between the songs. *Baxter*, 812 F.2d at 423. In *Baxter*, the Ninth Circuit found that the songs shared more similarities than just a six note segment, and a potentially qualitatively important segment at that. *Id.* at 425. The songs at issue in this case do not have as much in common as the songs in *Baxter* nor do they share a qualitatively important element that gives rise to a similar total concept and feel between the songs.

these similarities are merely cosmetic in nature. Because they are not qualitatively important, these elements fail to give rise to substantial similarity.

Even when viewing the alleged similarities in combination, we conclude that Francescatti has not plausibly alleged that the Gaga Song infringes on her song. *See Peters*, 692 F.3d at 636. A "unique combination" of elements otherwise undeserving of protection can form an original expression entitled to copyright protection. *Feist*, 499 U.S. at 362, 111 S. Ct. at 1296; *Hobbs*, 722 F.3d at 1093 n.4; *JCW*, 482 F.3d at 917; *Bucklew v. Hawkins, Ash, Baptie & Co.,* 329 F.3d 923, 929 (7th Cir. 2003). To prove substantial similarity in terms of a unique combination of elements, Francescatti must demonstrate that her song combines elements in a unique and substantially similar way as the Gaga Song. In other words, the "whole [must be] greater than the sum of its parts." *Stillman*, 720 F. Supp. at 1361 (finding substantial similarity where "the synergy of [] nonprotectible elements in the Eastern commercial creates a whole that is greater than the sum of its parts"); *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) (lists of random similarities held not probative of substantial similarity because such lists fail "to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another"); *Le Moine*, 1996 WL 332688, at *6 (finding no substantial similarity where "the similar appearance of the two works stems only from the individual elements they share, not from a substantially similar total concept and feel arising from the creative arrangement and interaction of common elements"). To hold that the combination of merely cosmetic similarities need not be unique would essentially do away with the ordinary observer "total concept and feel" test since plaintiffs could survive dispositive motions by merely alleging more than one similarity, no matter how disconnected the similarities are. Here, there is not a

unique combination of elements—the similar titles and the four 16th notes—such that they give rise to the songs' similar total concept and feel.

Needless to say, Francescatti cannot rely upon a combination of dissimilar expressions to establish substantial similarity. *Hobbs*, 722 F.3d at 1095–96 (finding that the plaintiff "cannot rely upon a combination of *dissimilar* expressions to establish that [defendant's song] infringes upon [plaintiff's song's] 'unique selection, arrangement, and combination of' of those expressions")(emphasis included). Accordingly, we agree with Defendants that Francescatti has not only failed to establish similarity between the individual elements, but she has also failed to establish that the songs share a similar, unique combination of elements. (Def.'s Reply 17.) The individual elements do not combine in such a way as to give rise to a similar total concept and feel between the songs.

Francescatti has not established similarity between the songs as a whole; between individual, qualitatively important elements; nor a unique combination of elements. The similar titles and the four 16th notes are not sufficient to give rise to a finding that the Gaga Song has captured the total concept and feel of the Francescatti Song. *See Peters*, 692 F.3d at 633–34. Thus, no reasonable trier of fact could find that the songs' expressions are substantially similar.

### *ii. The elements are not protectable*

Even if the expressions were similar, they are not protectable. First, the title of the Francescatti Song is not protectable. *Peters*, 776 F. Supp. 2d at 749–50 ("[T]itles by themselves are not subject to copyright protection."); *see also Hobbs*, 722 F.3d at 1096. The word "Juda" is found in 243 song titles, and the word "Judas" is found in 2,139 song titles (Shehab Rep. 17); *see*

-41-

*Hobbs*, 722 F.3d at 1096 (finding that the title was unprotectable because the United States Copyright Office's Registered Works Database reveals that numerous works share the titles, "Natasha" and "Nikita"). Moreover, the evidence suggests independent creation. *Peters*, 776 F. Supp. 2d at 749–50 (finding that "the work must have been independently created by the author to be original"); *Susan Wakeen Doll Co.*, 272 F.3d at 450; *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1169–70 (7th Cir. 1997). The title "Juda" reflects Francescatti's relationship with an acquaintance and the betrayal of her father whereas "Judas" was inspired by Gaga's feelings toward a former boyfriend. (Francescatti Dep. 138–140, 143, 173–74; Gaga Dep. 100:1–24.)

Second, repetition of the songs' respective titles in the lyrics is unprotectable. *See Hobbs*, 722 F.3d at 1096 ("Repetition is ubiquitous in popular music."); *Selle*, 741 F.2d at 905 (observing that "popular music" is a field "in which all songs are relatively short and tend to build on or repeat a basic theme"). Many musicians have repeated a title lyric, and in particular "Juda" and "Judas," in songs that predate the two songs at issue here. (SOF ¶¶ 59, 61–63.) In fact, Gaga herself on prior occasions has repeated her titles in her lyrics. (Ferrara Rep. at 18 n.13 (listing "Alejandro," "Bad Romance," and "Poker Face" as examples).) Where an allegedly copied element of a work appears in the defendant's prior works, the presumption is that the defendant copied that element from herself, not the plaintiff. *Murray Hill*, 361 F.3d at 326. Repetition of the titles in the songs' lyrics is therefore an unoriginal, unprotectable element.

Lastly, the four 16th notes are unprotectable because Francescatti cannot claim copyright protection over a single note. *Swirsky*, 376 F.3d at 849. The repetition of the note four times does not make it protectable because it is not a unique combination. *See infra*; *see also Peters*, 692 F.3d at 636 (quoting *Steele v. Turner Broad. Sys. Inc.*, 646 F. Supp. 2d 185, 192 (D. Mass.

2009) ("A common rhyme scheme or structure does not qualify as original expression under federal copyright law."); *Intersong-USA v. CBS, Inc.*, 757 F. Supp. 274, 282 (S.D.N.Y. 1991) (finding that "a recurring eighth note rhythm" was a "common element[] . . . found in many other well-known songs" and, thus is, "unoriginal and constitute[s] . . . ordinary, unprotectible expression").

We find that Francescatti has neither established that the elements are protectable nor has she established a unique combination of these unprotectable elements.

## CONCLUSION

For the reasons discussed above, we conclude as a matter of law that the two songs are not substantially similar. No reasonable trier of fact could find that Defendants copied protected expression in Francescatti's song. The songs do not "share enough unique features to give rise to a breach of the duty not to copy another's work." *Hobbs*, 722 F.3d at 1096 (citing *Peters*, 692 F.3d at 633–34). Accordingly, we grant Defendants' motion for summary judgment.

It is so ordered.

Marvin E. Aspen
United States District Judge

Dated:          Chicago, Illinois
                June 17, 2014